UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EVAN PIMENTAL,

        Plaintiff,

    v.

CITY OF HAYWARD AND DOES 1-50,

        Defendant.

Case No.  14-cv-04706-JCS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

Re: Dkt. Nos. 52, 54

## I.     INTRODUCTION

      This case arises out of the tragic death of Plaintiff's mother, who was shot and killed after officers of the Police Department of the City of Hayward went to her apartment to perform a "welfare check."  In the complaint, Plaintiff asserts a state law wrongful death claim and federal civil rights claims under 42 U.S.C. § 1983 against the City of Hayward and "DOE" defendants. Presently before the Court is Plaintiff's Motion for Leave to Amend to Substitute Hayward Officers People and Davis as Defendants ("Motion to Amend") and Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication of Claims ("Summary Judgment Motion").  For the reasons stated below, the Motion to Amend is GRANTED and the Summary Judgment Motion is GRANTED in part and DENIED in part.[1]

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    FACTUAL BACKGROUND[2]

On February 4, 2014, Hayward Police Officers Anthony People and Norman Davis were on duty working as patrol officers assigned to the "Boy" beat in the northern section of Hayward. Declaration of Officer Anthony People ("People Decl."), ¶ 6;  Declaration of Officer Norman Davis ("Davis Decl."), ¶ 8.   The officers wore standard blue police uniforms and drove Hayward Police Department ("HPD") patrol vehicles.  *Id*.  At approximately 7:15 p.m., HPD dispatch radioed a service request from the Pleasanton Police Department to perform a "welfare check" on a resident of the Summerwood Homes Apartment complex ("Summerwood").  People Decl., ¶ 7; Davis Decl., ¶ 9.  HPD dispatch identified Ariel Levy as the subject of the welfare check and gave her address as Unit 265 at Summerwood.  People Decl., ¶ 9; Davis Decl., ¶ 10;  *see also* Complaint[3] ¶ 5 (alleging that "[o]n February 4, 2014, about 7:15 p.m., two Hayward officers DOE defendants responded to a second-floor unit at the Summerwood Apartment Homes at 21701 Foothill Blvd. The officers were dispatched at the request of Pleasanton police for a welfare check on decedent, who suffered from severe mental depression and who had been calling the Pleasanton agency repeatedly.").

Summerwood has two driveways that connect to southbound traffic on Foothill Boulevard and serve as entry/exit points for vehicular access.  People Decl., ¶ 8. Officers People and Davis met at the southern driveway of the apartment complex and drove their patrol vehicles into the complex. People Decl., ¶ 11; Davis Decl., ¶ 11.  Ms. Levy's apartment was located at the northwest corner of the apartment complex. Davis Decl., ¶ 11.  The officers stationed their patrol vehicles just north of her unit.  People Decl., ¶ 11; Davis Decl., ¶ 11.

---

[2] Except where otherwise noted, the facts set forth below are undisputed.  Because Plaintiff does not oppose summary judgment as to his claim for "inadequate and reckless training" against the City of Hayward (Claim Four), the Court does not include in this summary of the background facts the evidence offered by Defendants relating to the training of Officers People and Davis or the general training practices and policies of the HPD.
[3] On the same day that he filed the original complaint in this action Plaintiff refiled the complaint, adding the case number that had been assigned by the Clerk's Office and changing the caption to "Amended Complaint."  The refiled complaint is identical to the original complaint in all material respects and therefore, the title "Amended Complaint" does not accurately describe that document. Henceforth, the Court refers to the "Complaint" rather than the "Amended Complaint" or the "First Amended Complaint." The Court understands Defendants' references to the Amended Complaint and the First Amended Complaint as referring to the original complaint, Docket No. 1.

United States District Court
Northern District of California

Ms. Levy's apartment was located on the second floor of a two-story structure that houses four apartment units total, with two units on the ground floor and two units on the second floor. People Decl., ¶ 12;  Davis Decl., ¶ 12.  The two units on the second floor are situated on opposite sides of the staircase. *Id*.  From the perspective of the sidewalk, Ms. Levy's unit was on the right side of the staircase. *Id*.

Officer People was assigned as the primary investigating officer on the call. People Decl., ¶ 7.  According to Officer People, he and Officer Davis got out of their patrol cars and walked up the staircase leading to Ms. Levy's apartment, with Officer People in the lead and Officer Davis following behind.  People Decl., ¶ 13; Davis Decl., ¶ 13. Officer People states in his declaration that he knocked on the door to Ms. Levy's unit and identified himself and Officer Davis as Hayward Police Officers and then looked in the front window.  *Id*.  He states that through the window he saw Ms. Levy "approaching the front door with a gun in her hand aimed at the front door."  People Decl., ¶ 14.  He further states that she had "a silver handgun and the hammer of the gun was cocked back" and that she was "aiming the gun in [his] direction." *Id*., ¶¶ 14, 16.  At that point, he told Officer Davis that Ms. Levy had a gun, according to his declaration. *Id*., ¶ 14; *see also* Davis Decl., ¶¶ 13-14.  Both Officers state that they backed up towards the opposite end of the landing and drew their weapons;  Officer People says that he also put out "radio traffic" indicating Ms. Levy was armed and calling for additional police units.  People Decl., ¶¶ 14-15; Davis Decl., ¶ 14.

According to Officer People, Ms. Levy then opened the door and he issued the command "Drop the gun. Drop the gun."  People Decl., ¶ 17;  *see also* Davis Decl., ¶ 15 (stating that he could not see Ms. Levy at that point but that he heard Officer People "issue[ ] multiple commands to 'Put the gun down'").  Officer People states further that Ms. Levy then slammed closed the door to the unit.  *Id.*  After Ms. Levy closed her door, Officer Davis states, he ran down the stairs to the sidewalk and into the carport in front of the building, followed by Officer People.  Davis Decl., ¶ 16; People Decl., ¶ 19.  According to Officer People, at that point he updated dispatch, stating that Ms. Levy had a "silver handgun" and did not want the officers to enter her apartment.  People Decl., ¶ 19.  Ms. Levy then opened the door of her apartment, according to the Officers.  People

United States District Court
Northern District of California

1    Decl., ¶ 20;  Davis Decl., ¶ 15.

2           According to both Officers' accounts, Ms. Levy began to walk down the stairs with the

3    gun in her hand.  People Decl., ¶ 20; Davis Decl., ¶¶ 17-19.   Officer People states that as she

4    walked down the stairs Ms. Levy "aimed the gun at [him] and [he] immediately took cover by

5    crouching behind a white car." People Decl., ¶ 20.  Officer People further states that he "started

6    yelling, 'Drop the gun. Drop the gun'" and that he "heard Officer Davis command, 'Drop the gun.

7    Drop the gun.'"  *Id*.  Feeling that the white car did not offer sufficient cover Officer People got up

8    to move behind an SUV, at which point he heard a single shot, followed by additional shots.  *Id*., ¶

9    21.

10          Officer Davis states in his declaration that when Ms. Levy opened the door to her unit he

11   saw that she had in her hand a silver colored gun that "appeared larger than [his] department-

12   issued handgun."  Davis Decl., ¶ 17;  *see also* Declaration of Jennifer Padavana in Support of

13   Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication of

14   Claims ("Padavana Decl."), ¶ 3 & Ex. A (photographs of replica handgun found at the scene on

15   February 4, 2014).    He states that he took cover behind a car in the carport, aimed his gun in Ms.

16   Levy's direction and yelled "Put the gun down. Put the gun down."  *Id*.  According to Officer

17   Davis, Ms. Levy disobeyed his commands and began to walk down the stairs, still holding the

18   gun.  *Id*., ¶ 18.  Officer Davis states that he continued to order Ms. Levy to "Put down the gun"

19   and to "Drop the Gun" and that he also said "Stop or I'll shoot" but she did not comply.  *Id*., ¶¶

20   18-19.  Officer Davis further states that when Ms. Levy was approximately three quarters of the

21   way down the stairs and about ten yards away from him, she "lifted her gun and aimed it at

22   [him]." *Id*. ¶ 21.  Officer Davis states that "[a]t that moment, I believed she was going to shoot me

23   with her gun and that she wanted to kill me."  *Id*.  He states that he fired four rounds at that point

24   to "protect [his] own life and that of Officer People."  *Id.*  According to Officer Davis, Ms. Levy

25   then dropped the gun, sat back on the steps and fell forward down the steps.  *Id*., ¶ 22.

26          The parties introduce the testimony of four witnesses:  Nancy Chamberlain, Terri Bethea,

27   Stephanie Young and Jason Parisi, all of whom are residents of Summerwood.  Ms. Chamberlain

28   was on the other side of a private road that runs by Ms. Levy's unit and had a clear line of sight to

4

the relevant events.  Declaration of Rafael E. Alvarado Jr., Assistant City Attorney for the City of Hayward, in Support of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication of Claims ("Alvarado Decl."), Ex. A (Chamberlain Dep.) at 18-19, 25 & Exhibit 1 (map of Summerland complex marked by Ms. Chamberlain to show location from which she observed relevant events).  Ms. Chamberlain testified that she saw Ms. Levy coming down the stairs holding a gun that appeared to be real.  *Id*. at 19-21.   She testified that the officers ordered Ms. Levy to put the gun down four or five times and that Ms. Levy did not put the gun down.  *Id*. at 20-21, 27.

According to Ms. Chamberlain, Ms. Levy was "just waving [the gun] up in the air, toward herself, and to everything.  And more to herself, actually."  *Id*. at 22.  When asked whether she had seen Ms. Levy "point the gun at the police officers," Ms. Chamberlain answered "yes."  *Id*. at 25.[4] Subsequently, she answered "Exactly" when asked: "And, in fact, you indicated that you saw her point the gun at the police officers;  correct?"  *Id*. at 27.  Later in the deposition, Ms. Chamberlain was asked what she saw at the point when Ms. Levy was "on the stairwell with the gun" and she answered as follows:

> It was more of a threat, I guess, to the police officers, and they took it by hand, and that's why they went ahead and – because she didn't take the command, and then the way she was doing the gun, of her motions and everything, they wasn't too sure because there was people like me standing out there, they didn't know what – because there were kids too, believe it or not, looking.  There was a lot of residents there, and the threat – they just wanted to make sure, that it was a threat, yeah.

*Id*. at 26-28.[5]   Ms. Chamberlain testified that when Ms. Levy was approximately ten feet from the officers she heard two shots and then saw Ms. Levy roll down the stairs.  *Id*. at 25, 29.

Ms. Bethea testified that she was on her back patio smoking a cigarette when she heard the voice of someone who was "rambling incoherently."  Alvarado Decl., Ex. B (Bethea Dep.) at 15.

---

[4] In addition to her deposition, which was conducted on June 9, 2016, Ms. Chamberlain was interviewed by an investigator, Detective John Racette, a few weeks after the relevant events, on February 21, 2014, about what she observed.  *See* Declaration of John Racette in Support of Defendant's Motion for Summary Judgment, or in the Alternative for Summary Adjudication of Claims ("Racette Decl."), ¶ 3 & Ex. A (video recording).  In that interview, she stated that she observed Ms. Levy waving the gun around but she did not state that Ms. Levy aimed the gun at the officers.

1    She could not make out if the voice was that of a man or a woman. *Id*. According to Ms. Bethea,

2    she was "really not paying it any attention, just . . . thinking it's two people . . . talking." *Id*.  She

3    testified that then she "heard a man" who "either said 'Put the knife down' or 'Put the gun down'

4    or 'Put the weapon down.'" *Id*. at 15-16.  Next, she testified, she heard a gunshot and ran into the

5    house. *Id*. at 16.  As she was running, she heard another gunshot, she said.  *Id*.

6           Stephanie Young also lived at Summerwood, in Unit 256, which is a second-floor unit

7    across from Ms. Levy's unit.  *See* Declaration of Raymond R. Rollan, Deputy City Attorney for

8    the City of Hayward, in Support of Defendant's Motion for Summary Judgment, or in the

9    Alternative for Summary Adjudication of Claims ("Rollan Decl."), Ex. A (Young Dep.) at 8, 10

10   (testifying that she lived in Unit 256 and that it is on the second floor); *see also* Alvarado Decl.,

11   Ex. A (Chamberlain Dep.), Exhibit 1 (Map of Summerland apartment complex with unit

12   numbers).  Ms. Young testified that at the time of the relevant events she had just gotten home

13   from work and her children were "throughout the apartment."  Rollan Decl., Ex. A (Young Dep.)

14   at 9.  She was on her balcony watering her plants when she saw a police officer with his gun

15   drawn crouched by her vehicle. *Id*. at 9-10. According to Young, at that point she "backed off"

16   her balcony into the living room. *Id*. at 13.  She testified that two of her children were in the

17   living room and that she asked her oldest son to "take the kids and go to [her] bedroom, which is

18   in the back of the unit, the furthest window away from the balcony." *Id*.

19          Ms. Young testified that "once [she] made sure they were safe, when [she] came back in"

20   she "went to go back to the balcony to close everything up and hopefully to see if that officer had

21   left." *Id*. at 15.  She stated that "prior to . . .getting back to the [sliding glass door to the balcony] .

22   . .[she] heard shouting" and she saw her neighbor out. *Id*. at 16.  Ms. Young stated, "her door . . .

23   was open and she was out, and I just heard yelling." *Id*.  Ms. Young said that she "[didn't] know

24   if it was her or the police officers or who it was yelling at the time." *Id*.   She testified that she

25   "[didn't] think [she] even tried to decipher" whether the voices were male or female.  *Id*. She also

26   testified that she couldn't "make out what the voices were saying" at that point.  *Id*.  When asked

27   if she heard any warnings from the police, she testified that she "heard shouting" but "didn't hear

28   anything about a gun or anything." *Id*. at 37.

United States District Court
Northern District of California

1    According to Ms. Young, after she returned to the door to her balcony she saw her

2  neighbor, then "backed up again," at which point she heard gunshots and squatted down.  *Id*. at 20.

3  When asked what she saw when she looked out and saw her neighbor, Ms. Young testified that

4  she "[didn't] recall [Ms. Levy] was doing anything."  *Id*. at 22. When asked if she remembered

5  "seeing anything in her hands," Ms. Young answered, "I don't."  *Id*.  She described what she saw

6  as follows:

7            I felt like she was, um – I felt like my gaze was kind of scattered.
             Like, I remember looking, seeing her, I looked to the left, seeing –
8            you know, there was just a lot of things going on at the time, but I
             remember seeing her at one point stay closer to her door, and then at
9            another point I seen her closer to the staircase, but I don't remember
             her fluidly moving.
10

11  *Id*.  She testified further that she did not see Ms. Levy fall down the stairs but did see her "after

12  she had kind of fell halfway down the stairs."  *Id*. at 22-23.  When asked whether she was

13  "peeking out as the shooting occurred," Ms. Young answered, "I don't know."  *Id*. at 23.  She

14  explained, "I was standing up, but I don't know what I was looking at at that time because my

15  eyes were kind of darting around, but I was standing up when it happened because I know, right

16  after it happened, I went down."  *Id*.  When asked whether she had seen Ms. Levy "point anything

17  at the officers at the time [she] was looking," Ms. Young said "no."  *Id*. at 37.

18    Jason Parisi lived in Unit 165, the unit beneath Ms. Levy's unit.  Rollan Decl., Ex. B

19  (Parisi Dep.) at 7;  *see also* Alvarado Decl., Ex. A (Chamberlain Dep.), Exhibit 1 (Map of

20  Summerland apartment complex with unit numbers).  He testified that he and his girlfriend were

21  in the apartment when the relevant events occurred.  *Id*. at 7.  According to Parisi, he was playing

22  video games with headphones on and his girlfriend was on the computer playing music when he

23  heard a loud "bang" that he believed was a gunshot, followed by three more shots in succession.

24  *Id*. at 7, 9.  He testified that he did not hear any commands before the gun shots and that while he

25  was at a distance from which it would have been possible to hear commands by the police officers,

26  what he "heard, ultimately, was the music, over anything" because his girlfriend "like[d] to blast

27  music."  *Id*. at 25.

28    After Ms. Levy was shot, an investigation was conducted by Police Detective John

Racette.  Racette Decl., ¶¶ 2-3.  A note was found in Ms. Levy's apartment that Detective Racette describes as a "suicide note."  Racette Decl., ¶ 7 & Ex. B.  He also states in his declaration that "[a]s part of the investigation, [he] inspected the replica gun used by Ariel Levy during the incident."  *Id.* ¶ 8.  According to Detective Racette, the gun is "a direct replica of a real gun, of metal composition, and capable of shooting pellets."  *Id.*  He states that "[f]urther contributing to its realistic appearance, the gun had been modified to enlarge the gun barrel."  *Id.*

## III.     PROCEDURAL BACKGROUND

Plaintiff Evan Pimental, Ms. Levy's son, initiated this action on October 22, 2014, naming the City of Hayward and DOES 1-50 as defendants.   He asserted  four claims: 1) Wrongful Death pursuant to California Code of Civil Procedure section 377.34, asserted against the City of Hayward and DOES 1-50; 2) Violation of Ms. Levy's Civil Rights under 42 U.S.C. § 1983 based on alleged violation of her Fourth Amendment Rights, asserted against all Defendants; 3) Violation of Ms. Levy's Civil Rights under 42 U.S.C. § 1983 based on alleged violation of her Fourteenth Amendment Rights, asserted against all Defendants; and 4) Violation of Ms. Levy's Civil Rights under 42 U.S.C. § 1983 based on alleged inadequate and reckless training, asserted against the City of Hayward and DOES 30-50.  The Complaint states that a declaration is attached, as required under California Code of Civil Procedure section 377.32, showing that Mr. Pimental has standing to bring a wrongful death action based on the death of Ms. Levy, but no such declaration was attached to the complaint.  Nor has one been filed in this action.

The City of Hayward served its initial disclosures on Plaintiff on August 17, 2015.  See Declaration of Raymond R. Rollan in Support of Defendant's Opposition to Plaintiff's Motion for Leave to Amend Complaint ("Rollan Opposition Decl."), ¶ 2 & Ex. A.  The initial disclosures listed Officers People and Davis ("the Officers"), along with numerous other police officers, as individuals who might "testify to the incident of which Plaintiff complains, as set forth in Hayward Police Department Incident Report No. 2014-9407 [hereinafter,'the Incident Report']."  Rollan Opposition Decl., Ex. A at 5.   At oral argument, Plaintiff's counsel conceded that the Incident Report identified Officers People and Davis as the two officers involved in the shooting of Ms. Levy and that he was aware that these were the Officers involved from the time that

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Defendants made their initial disclosures.  Plaintiff did not, however, depose these officers.

2  Rollan Opposition Decl., ¶ 4.   Plaintiff and the City of Hayward conducted depositions of other

3  witnesses on June 9-10, 2016.  *Id.*, ¶ 4.

4       On July 21, 2016, the City of Hayward filed its Summary Judgment Motion seeking

5  dismissal of all four claims asserted in the Complaint.  On August 2, 2016, Plaintiff filed his

6  Motion to Amend.

7  **IV.     MOTION TO AMEND**

8       Plaintiff seeks leave to amend to substitute the officers who engaged in the conduct of

9  which he complains, Officers People and Davis, for DOE defendants.   The Court GRANTS

10  Plaintiff's request.

11       Pursuant to Rule 15(a), a party may amend a pleading once as a matter of course;

12  subsequently, it may only amend after obtaining leave of the court, or by consent of the adverse

13  party.  *See* Fed.R.Civ.P. 15(a).  Rule 15 advises the court that "leave shall be freely given when

14  justice so requires."  Fed.R.Civ.P. 15(a)(2).  "[T]his policy is to be applied with extreme

15  liberality." *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 712 (9th Cir. 2001). "Courts

16  may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or

17  dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

18  previously allowed, undue prejudice to the opposing party by virtue of allowance of the

19  amendment, [or] futility of amendment, etc.'" *Sonoma County Ass'n of Retired Employees v.*

20  *Sonoma County*, 708 F.3d 1109,  1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178,

21  182 (1962)).  These factors are referred to as the "*Fomen* factors."  *Id.*

22       The *Fomen* factors "are not of equal weight in that delay, by itself, is insufficient to justify

23  denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)

24  (citations omitted).  Prejudice, on the other hand, is the weightiest and most important of the

25  *Fomen* factors.  *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d  at 1117

26  (citing *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003)).

27       "Because a motion for leave to amend is not a vehicle to circumvent summary judgment,  .

28  . . a pending motion for summary judgment militates against [granting] a motion to amend."

1    *Maldonado v. City of Oakland*, No. C 01 1970 MEJ, 2002 WL 826801, at *5 (N.D. Cal. Apr. 29,

2    2002) (citing *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1492 (9th

3    Cir. 1983)).  Further, "[f]utility of amendment can, by itself, justify the denial of a motion for

4    leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

5        Here, Plaintiff has unduly delayed seeking leave to amend to name Officers People and

6    Davis as defendants in this action.  While there is no evidence of bad faith on the part of Plaintiff,

7    it is undisputed that he became aware of the identities of the Officers almost a year before he

8    sought leave to amend his complaint.   On the other hand, the Court does not find that the

9    prejudice that will result from allowing Plaintiff to amend is so severe as to warrant denial of leave

10   to amend.  This is not a situation where plaintiff seeks to introduce "new allegations [that] would

11   totally alter the basis of the action, in that they covered different acts, employees and time

12   periods." *See M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1492 (9th Cir.

13   1983).  Rather, it has been clear from the start that Plaintiff intended to assert claims against both

14   the Officers and the City of Hayward; his delay was only in amending the complaint to substitute

15   DOE defendants with the Officers' names.   Indeed, Defendant City of Hayward addressed the

16   claims against the Officers in its Summary Judgment Motion even *before* Plaintiff filed the

17   Motion to Amend.  For the same reason, the Motion to Amend does not amount to an attempt to

18   evade summary judgment through the introduction of new claims or defendants.  Moreover, the

19   claims that Plaintiff asserts against the City of Hayward turn, in part, on the same questions as the

20   claims Plaintiff seeks to assert against the Officers, namely, the reasonableness of the Officers'

21   conduct, which reduces the prejudice that will result from permitting Plaintiff to amend the

22   complaint.  Accordingly, the Court GRANTS Plaintiff's Motion to Amend.

23   **V.    SUMMARY JUDGMENT MOTION**

24       **A.    Contentions of the Parties**

25           **1.  Motion**

26       In its Summary Judgment Motion, Defendant City of Hayward contends it is entitled to

27   summary judgment on all of Plaintiff's claims, including the claims Plaintiff seeks to assert

28   against Officers People and Davis.  First, Defendant argues that it is entitled to summary judgment

United States District Court
Northern District of California

on Claim Four, for alleged inadequate and reckless training in violation of 42 U.S.C. § 1983, because Plaintiff has not met his burden under *Monell v. New York City Dep't of Social Service*, 436 U.S. 568, 691 (1978).  Summary Judgment Motion at 11-14.

Second, Defendant argues Claim Two, asserted under 42 U.S.C. § 1983 based on alleged violation of the Fourth Amendment, fails because the undisputed facts show that the Officers involved acted reasonably, as a matter of law.  *Id*. at 15-17.  Further, to the extent Plaintiff seeks to assert this claim against Officers People and Davis, Defendant argues, the claim fails because the Officers did not violate a clearly established statutory or constitutional right of which a reasonable person would have known and therefore, they are entitled to qualified immunity.  *Id*. at 17-20.

Third, Defendant argues that Plaintiff's wrongful death claim (Claim One) should be dismissed for the same reason Claim Two fails, namely, that the Officers' conduct was reasonable and therefore, that the homicide was justifiable.  In addition, Defendant argues that the Officers are immune from liability on the wrongful death claim under California Government Code section 820.2.  *Id*. at 21-22.  Defendant also argues that Plaintiff has not filed the affidavit required under California Code of Civil Procedure section 377.32 showing that he has standing to maintain a wrongful death action as Ms. Levy's successor in interest.  *Id*. at 2-3.

Finally, Defendant contends summary judgment should be granted as to Claim Three for the alleged violation of his Fourteenth Amendment due process rights.  *Id*. at 22-23.  It argues that Plaintiff's claim is governed by the "shocks the conscience" standard, which is met where conduct involved a snap judgment in an escalating situation only if an officer acts "with a purpose to harm unrelated to legitimate law enforcement objectives."  *Id*. at 22 (quoting *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)).  Plaintiff has not demonstrated a constitutional violation under that standard, Defendant contends.  *Id*.  at 22-23.

### 2.  Opposition

Plaintiff contends there are fact questions as to whether the Officers acted reasonably or engaged in conduct that "shocks the conscience" and therefore, that summary judgment must be denied on  Plaintiff's Fourth and Fourteenth Amendment claims asserted under 42 U.S.C. § 1983,

United States District Court
Northern District of California

Claims Two and Three.  Opposition at 7-12.[6]  Plaintiff cites to the eyewitness testimony of Jason Parisi and Stephanie Young that they did not hear the Officers tell Ms. Levy to drop the gun, Ms. Young's testimony that she did not see anything in Ms. Levy's hand, and the videotaped interview of Ms. Chamberlain in which the hand motions she made to show how Ms. Levy was waving the gun could reasonably be interpreted as showing that Ms. Levy did not aim her gun at the Officers, contrary to the Officers' declarations.  *Id*.  Plaintiff argues that based on this evidence a jury could reasonably conclude that the Officers did not give adequate warning before shooting Ms. Levy and that she was not pointing a gun at them – or even holding a gun – when she was shot.  *Id*.  Further, to the extent a jury believes that Ms. Levy was not adequately warned or did not pose a threat to the Officers, the Officers also are not entitled to qualified immunity, Plaintiff argues.  *Id*. at 13-15.

With respect to the wrongful death claim, Claim One, Plaintiff concedes that although he pled in the complaint he is acting as Ms. Levy's personal representative, he did not file the required affidavit.  *Id* at 15.  He asks the Court's leave to file the affidavit in order to cure this defect.  *Id*.  He further asserts that because the wrongful death claim turns on the same question as the Fourth Amendment claim, namely, whether the officers acted reasonably or instead used excessive force, there are fact questions as to the wrongful death claim for the same reasons there are fact questions that preclude summary judgment on Claim Two.

Plaintiff does not oppose summary judgment with respect to Claim Four, for reckless and inadequate training under *Monell*.  *Id*. at 19.

Finally, Plaintiff argues he should be permitted to amend the complaint to name Officers People and Davis as defendants for the same reasons offered in his Motion to Amend and reply brief on that motion. *Id*. at 17-19

### 3.  Reply

In its Reply brief, Defendant argues that the testimony cited by Plaintiff of Young, Parisi and Chamberlain is actually consistent with Defendant's version of the facts and therefore does not establish that there are material issues of fact that preclude summary judgment.  Reply at 1-2.

---

[6] Because Plaintiff's Opposition brief has no page numbers the Court cites to the page numbers assigned to the document by ECF, the Court's electronic filing system.

United States District Court
Northern District of California

Defendant argues that leave to amend should be denied for the same reasons offered in its

opposition on the Motion to Amend but argues that even if Plaintiff is permitted to amend,

summary judgment on the Fourth Amendment claim (Claim Two) should be granted because the

Officers acted reasonably. *Id*. at 4-7. Similarly, Defendant asserts, summary judgment should be

granted on the Fourteenth Amendment claim because the evidence establishes that the Officers did

not engage in conduct that "shocks the conscience." *Id*. at 8. Defendant also argues that the

officers are entitled to qualified immunity under the totality of the circumstances because they did

not violate clearly established law when they used deadly force. *Id*.at 8-9. Finally, as to the

wrongful death claim, Defendant asserts Plaintiff should not be permitted to file the required

affidavit showing that he has standing on this claim, but even if he is, the Officer's actions were

objectively reasonable and therefore, summary judgment should be granted on this claim.

### B. Legal Standard under Rule 56 of the Federal Rules of Civil Procedure

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show

the absence of a genuine issue of material fact with respect to an essential element of the non-

moving party's claim, or to a defense on which the non-moving party will bear the burden of

persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

made this showing, the burden then shifts to the party opposing summary judgment to designate

"specific facts showing there is a genuine issue for trial." *Id*. On summary judgment, the court

draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372,

378 (2007).

### C. Analysis

#### 1. Federal Civil Rights Claims

##### a. Legal Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 provides "a method for vindicating federal rights elsewhere conferred."

*Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)). Thus, analysis of a civil

rights claim brought under § 1983 begins with the identification of the "specific constitutional

United States District Court
Northern District of California

right allegedly infringed by the challenged application of force." *Id.* at 394 (citation omitted).

The claim is then evaluated under the constitutional standards that apply to that constitutional

right. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)).

### b.  Claim Two (Fourth Amendment)

#### i.   Legal Standards Regarding Use of Excessive Force

Plaintiff's excessive force claim is asserted under the Fourth Amendment and therefore is

analyzed under the Fourth Amendment's "objective reasonableness" standard. *Arpin v. Santa*

*Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001).    "In considering an

excessive force claim, [courts] balance 'the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake.'" *Graham*

*v. Connor*, 490 U.S. 386, 396 (1989).  Determining whether the force used was reasonable

"requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Of these factors, the Ninth Circuit has held

that the most important is "whether the suspect poses an immediate threat to the safety of the

officers or others." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

"An officer's use of deadly force is reasonable only if 'the officer has probable cause to

believe that the suspect poses a significant threat of death or serious physical injury to the officer

or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471

U.S. at 3; citing *Graham v. Connor*, 490 U.S. at 396).  Thus, even where a suspect is in flight, "if

the suspect threatens the officer with a weapon or there is probable cause to believe that he has

committed a crime involving the infliction or threatened infliction of serious physical harm,

deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has

been given." *Tennessee v. Garner*, 471 U.S. at 11.

In *Scott*, the Ninth Circuit highlighted the difficulty of adjudicating excessive force claims

involving the use of deadly force:

Deadly force cases pose a particularly difficult problem under this

14

1

2

3

4

5

6

7

8

> regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. *Hopkins*, 958 F.2d at 885–88; *Ting v. United States*, 927 F.2d 1504, 1510–11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

9

*Id.* at 915.

10

The Court's inquiry is not limited to the three factors specifically enumerated in *Graham*,

11

because "the test of reasonableness under the Fourth Amendment is not capable of precise

12

definition or mechanical application." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

13

        ii.   Whether Defendants are Entitled to Summary Judgment on the Basis that the Officers' Use of Force Was Reasonable

14

15

While many deadly force cases involve individuals suspected of committing a crime (in

16

which case, the severity of the crime may factor into the determination of whether the force used

17

was reasonable), in this case it is undisputed that Ms. Levy was not suspected of having

18

committed any crime and the Officers were performing a "welfare check," apparently at Ms.

19

Levy's own request. Consequently, the question of whether the Officers' use of force was

20

reasonable turns primarily on whether they reasonably believed that she posed a significant threat

21

of death or serious physical to the Officers or others in the area at the time of the encounter. *See*

22

*Graham*, 490 U.S. at 396.   Closely related to this question is whether it was feasible to warn Ms.

23

Levy before using deadly force and whether the Officers did, in fact, warn her that they would use

24

deadly force if she did not comply with their commands.  The evidence on all of these questions is

25

disputed.

26

First, the testimony of Ms. Chamberlain is ambiguous as to whether Ms. Levy aimed her

27

gun (assuming she was holding one) at the Officers or was simply waving it around wildy, as Ms.

28

Chamberlain's hand motions in her initial interview with the police investigator seem to suggest.

United States District Court
Northern District of California

1    Notably, Ms. Chamberlain did not tell the investigator in that interview that she saw Ms. Levy aim

2    the gun at the Officers;  it was only later, when she was expressly asked whether Ms. Levy had

3    aimed the gun at the Officers that she said yes. This possible inconsistency alone raises factual

4    questions as to whether Ms. Levy ever aimed a gun at the Officers.  In addition, Ms. Young

5    testified that she saw Ms. Levy on the stairs before she was shot and that she did not remember

6    seeing anything in Ms. Levy's hand; nor did she remember seeing Ms. Levy point anything at the

7    officers.  This testimony raises fact questions as to whether Ms. Levy was still holding the gun

8    when she was shot, and/or whether (if she was holding a gun) she aimed it at the officers, which,

9    in turn, is relevant to whether she posed a sufficient threat to justify the use of deadly force. [7]

10        Second, there are fact questions as to whether Ms. Levy was warned and regarding the

11   adequacy of those warnings.  While Ms. Bethea testified that she heard the Officers order Ms.

12   Levy to drop *something*, she could not hear well enough to make out the exact command.  Officer

13   Davis states that he ordered Ms. Levy to "drop the gun" many times and then ultimately said,

14   "Stop or I'll shoot," but no other witness testified to hearing the latter command.  And while Ms.

15   Chamberlain says that the Officers yelled to Ms. Levy to drop the gun, Mr. Parisi, who lived

16   directly below Ms. Levy, said he heard no such commands.  While he admitted that he was

17   listening to loud music at the time, he also stated that he believed that he would have been able to

18   hear shouted commands by the Officers had they been given, as the Officers were just outside of

19   his apartment.  Ms. Young also testified that while she heard shouting, she heard nothing about a

20   gun.  The Court may not weigh this conflicting testimony.  Rather, it is up to a jury to decide

21   which version of the relevant events is more believable and whether the Officers acted reasonably

22   under the circumstances.  Therefore, the Court rejects Defendant's request for summary judgment

23   on Claim Two on the basis that the Officers' use of deadly force was reasonable.

24                           iii.  Qualified Immunity

25        Qualified immunity protects government officials performing discretionary functions

26

27   [7] At oral argument, Plaintiff stipulated that he does not dispute that at *some* point Ms. Levy was
     holding a replica gun.  Indeed, the Complaint alleges that Ms. Levy "walked toward [the Officers]
28   with a replica gun."  Complaint ¶ 7.  Nonetheless, the Court does not construe this allegation as an
     admission that Ms. Levy was still holding it at the time she was shot.

United States District Court
Northern District of California

1   "from liability for civil damages insofar as their conduct does not violate clearly established

2   statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

3   *Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). "Qualified immunity balances two

4   important interests—the need to hold public officials accountable when they exercise power

5   irresponsibly and the need to shield officials from harassment, distraction, and liability when they

6   perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme

7   Court has stated that the "driving force behind the creation of the qualified immunity doctrine was

8   a desire to ensure that insubstantial claims against government officials will be resolved prior to

9   discovery." *Id*. (internal citations omitted). Thus, courts should resolve questions of qualified

10  immunity "at the earliest possible stage in litigation." *Id*. at 231-32 (citing *Hunter v. Bryant*, 502

11  U.S. 224, 227 (1991)).

12          There are two questions in the qualified immunity analysis: (1) whether there was a

13  deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory

14  right was "clearly established" at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194

15  (2001); *Pearson*, 555 U.S. at 232. In *Saucier*, the Supreme Court held that the qualified immunity

16  analysis required that the district court first determine whether there was a violation of the

17  plaintiff's constitutional rights and that only if such a violation was found should it proceed to the

18  question of whether the violation involved a clearly established right. 533 U.S. at 201. In

19  *Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need

20  not be done in any particular order. 555 U.S. at 236. The Court reasoned that while the approach

21  required under *Saucier*'s mandate may have a beneficial effect on the development of precedent,

22  "[t]here are cases in which it is plain that a constitutional right is not clearly established but far

23  from obvious whether in fact there is such a right." *Id*. at 237. Therefore, the Court concluded, a

24  more flexible approach is warranted and will permit the lower courts to "determine the order of

25  decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

26          The inquiry as to whether a constitutional right is clearly established is "particularized."

27  *Saucier*, 533 U.S. at 201. It is not enough that the general rule is established. *Id*. Rather, "[t]he

28  contours of the right must be sufficiently clear that a reasonable official would understand that

United States District Court
Northern District of California

United States District Court
Northern District of California

what he is doing violates that right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   Although the existence of a clearly established constitutional right is usually demonstrated on the basis of cases involving similar facts where the alleged conduct has been found to be unconstitutional, "[w]hen the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established."  *Deorle v. Rutherford*, 272 F.3d 1272, 1285-1286 (9th Cir. 2001) (quotation and citation omitted).   The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision."  *Saucier*, 533 U.S. at 205.

Here, the Court has found that there is a fact question as to whether the Officers violated Ms. Levy's Fourth Amendment right to be free from excessive force.  Therefore, the Officers are entitled to qualified immunity at this stage of the case only if the Court finds that even assuming they used excessive force, they did so based on a reasonable, though mistaken, belief that under established case law, their conduct was reasonable. As discussed above, on summary judgment, the Court relies on undisputed facts and, where facts are disputed, must draw all reasonable inferences in favor of the party opposing summary judgment.  Depending upon what the jury finds transpired just before Ms. Levy was shot, and drawing all reasonable inferences in Plaintiff's favor, the jury could find that the Officers shot Ms. Levy after she had dropped her replica gun,[8] and possibly without providing adequate warnings.  A reasonable officer would have known under the preexisting case law that shooting an unarmed individual who posed no threat constituted excessive force under the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. at 10 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").  Therefore, summary judgment on the question of qualified immunity is not warranted.

---

[8] The Court notes that there does *not* appear to be any dispute that the gun that Ms. Levy at some point held was one that a reasonable police officer would have believed was a real gun.  In particular, Defendant has introduced pictures of the gun and testimony by police detective Racette as to the realistic appearance of the gun.  Plaintiff has not introduced any testimony suggesting that the Officers would have had reason to believe the gun was not real.

United States District Court
Northern District of California

1    c.   Claim Three (Fourteenth Amendment)

2        The Fourteenth Amendment's substantive due process clause protects against the arbitrary

3    or oppressive exercise of government power.  *County of Sacramento v. Lewis*, 523 U.S. 833, 845-

4    46 (1998).  "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process

5    violation."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).   The standard used to

6    determine whether a defendant's conduct shocks the conscience depends upon the circumstances.

7    *Id*.  Where there is enough time to allow for actual deliberation, courts ask whether the defendant

8    acted with "deliberate indifference."  *Id*.  On the other hand, "[w]here a law enforcement officer

9    makes a snap judgment because of an escalating situation, his conduct may be found to shock the

10   conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement

11   objectives."  *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson*

12   *v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

13       Plaintiff contends there are fact questions as to whether the Officers had time to deliberate

14   and as to whether they acted with deliberate indifference, thus precluding summary judgment.  He

15   has pointed to no case, however, in which a court has held that under circumstances such as those

16   in this case the deliberate indifference standard applied.  Nor does the Court find any such case.

17   Given that it is undisputed that *at some point* Ms. Levy was holding a gun that appeared to be a

18   real gun and that she came out of her apartment and walked down the stairs toward the Officer, it

19   is apparent that the relevant events played out quickly and did not allow for the sort of deliberation

20   that is involved in cases where the deliberate indifference standard applies.  Nor has Plaintiff

21   introduced any evidence that would support a reasonable inference that the Officers acted with a

22   purpose to harm unrelated to legitimate law enforcement objectives.  Therefore, the Court

23   GRANTS summary judgment on Plaintiff's Fourteenth Amendment due process claim, Claim

24   Three.

25   **2.   State Wrongful Death Claim**

26       As a preliminary matter, Defendant does not identify any actual prejudice that would result

27   from allowing Plaintiff to file the affidavit required under California Code of Civil Procedure

28   section 377.32 to establish standing to assert a wrongful death claim.   Plaintiff alleged in the

Complaint that he is the "heir, successor in interest and survivor of decedent Ariel Levy." Complaint ¶ 1.  Defendant has not asserted that Mr. Pimental does not satisfy the substantive requirements for proceeding on his wrongful death claim as Ms. Levy's successor in interest. Accordingly, Plaintiff will be permitted to cure this defect by filing the required affidavit.[9]

The Court further finds that there are fact questions that preclude summary judgment on the wrongful death claim.  Plaintiff's state law wrongful death claim is based on allegations that Officers People and Davis used excessive force and acted unreasonably in shooting Ms. Levy. Under California law, there can be no civil liability where a homicide is found to be justifiable under California Penal Code section 196.  "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances 'reasonably create[d] a fear of death or serious bodily harm to the officer or to another.'" *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996) (quoting *Kortum v. Alkire*, 69 Cal. App. 3d 325, 333 (1977)). Similarly, "[i]n actions involving claims under state law, an officer's use of deadly force is privileged as a matter of law if he reasonably fears for his safety or that of others in the area." *Reynolds v. Cty. of San Diego*, 858 F. Supp. 1064, 1074 (S.D. Cal. 1994), aff'd in part, remanded in part, 84 F.3d 1162 (9th Cir. 1996) (citing *People v. Rivera*, 8 Cal. App. 4th 1000, 1007 (1992) (citing Cal. Gov. Code § 820.2)).  For the same reasons the Court finds that there are fact questions as to Plaintiff's Fourth Amendment claim, the Court concludes that there are fact questions as to Plaintiff's wrongful death claim.  Therefore, Defendant's request for summary judgment on that claim is DENIED.

## VI.    CONCLUSION

For the reasons stated above, the Court GRANTS the Motion to Amend.  The Court also GRANTS the Summary Judgment Motion as to Claims Three and Four, which are dismissed with prejudice.  With respect to the remaining claims, the Motion is DENIED.  All dates, including trial, are vacated.  New dates for the case regarding discovery and trial will be addressed in a

---

[9] On October 11, 2016, Plaintiff filed his First Amended Complaint and the affidavit required under section 377.32, thus meeting the deadline set by the Court at oral argument.  *See* Docket No. 61-1.

United States District Court
Northern District of California

1 | separate case management order.

2 |      **IT IS SO ORDERED.**

3 |

4 | Dated: October 12, 2016

5 |

6 | JOSEPH C. SPERO
   Chief Magistrate Judge

United States District Court
Northern District of California